# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**ROBERT SKENANDORE, SR.**

    **Plaintiff,**

  **v.**              **Case No. 05-C-0234**

**JEFFREY P. ENDICOTT, MATTHEW FRANK,
STEVE BECK, SUE DEHAAN, KRISTINE TIMM,
SALLY WESS, LEO CAMPBELL, JOHN RAY,
CINDY O'DONNELL, SANDRA HAUTAMAKI,
RICHARD RAEMISCH, JAMES MUENCHOW,
GARY McCAUGHTRY, CATHY JESS,
CAPTAIN MURASKI, C.O. MAXWELL,
STANLEY R. TONN, GLORIA TOMASEK-HARPER,
and DONNA POORTENGA,**

    **Defendants.**

---

# DECISION AND ORDER

---

   The plaintiff, Robert Skenandore, Sr., who is currently incarcerated at Stanley Correctional Institution, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff is proceeding *in forma pauperis* on claims that the defendants' actions violated his rights under the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1(a), et. seq. Before the court are the defendants' motion for summary judgment and the plaintiff's motion for preliminary injunction.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. FACTUAL BACKGROUND

On March 1, 2005, the plaintiff lodged a civil rights complaint against defendant Jeffrey P. Endicott. By order of March 4, 2005, the plaintiff was permitted to proceed on claims that his rights under the First Amendment and RLUIPA were violated during his incarceration at Red Granite Correctional Institution. Subsequently, on October 27, 2005, the plaintiff amended his complaint to add eighteen additional defendants as well as claims concerning events that occurred during his incarceration at Waupun Correctional Institution.

On November 3, 2005, the plaintiff filed a motion for preliminary injunction. The defendants submitted a response to the plaintiff's motion on February 22, 2006. Also on February 22, 2006, the defendants filed a motion for summary judgment. The plaintiff filed his response to the defendants' motion on May 1, 2006.[1] Thus, both motions are fully briefed and ready for disposition.

## A. Standard of Review

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson*

---

[1]As will be discussed, *infra*, the plaintiff filed his first response to the defendants' motion on March 13, 2006. (*See* Doc. #88 & #89). However, the court ordered the plaintiff to file a more meaningful response after determining that his first response was insufficient. (*See* Order of April 20, 2006, at 5 n.3).

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id*. For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id*.

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id*. at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id*. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id*. at 323-24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable

inference from the record - only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

**B.    Preliminary Matters**

The plaintiff filed an amended complaint on October 27, 2005.  The court notes that the amended complaint does not contain any of the exhibits (most of which are copies of Inmate Complaint Review System documents), that were attached to the original complaint.  However, the plaintiff's subsequent filings refer to these exhibits.  Based on this, the court finds that the operative complaint in this action consists of the amended complaint in its entirety as well as the exhibits attached to the original complaint.  *Duda v. Board of Ed. Of Franklin Park Public School District No. 84*, 133 F.3d 1054, 1056 (7th Cir. 1998). The original complaint will not be considered as part of the operative complaint.  *See id.*

The facts at issue must be established through documents that ensure reliability and veracity, such as depositions, answers to interrogatories, admissions and affidavits.  *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir. 1985).   A prisoner plaintiff can demonstrate the veracity of a document by swearing under penalty of perjury that his statements are true.  *See* 28 U.S.C. § 1746.  If a complaint is sworn, it will be treated as an affidavit at the summary judgment stage. *Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996). For this reason, the facts are taken from the plaintiff's amended complaint and exhibits and his affidavit of November 3, 2005, as well as the defendants' affidavits and supporting exhibits to the extent they comply with Fed. R. Civ. P. 56 (c) and (e).  *See Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir.

2004) (Inmate's verified response constituted competent evidence to rebut defendants' motion for summary judgment).[2]

An initial comment is also necessary with respect to the plaintiff's response to the defendants' motion for summary judgment. On March 31, 2006, the plaintiff filed a one-page response to the defendants' motion for summary judgment. The plaintiff's filing, which purported to respond to the defendants' motion, did nothing of the sort. Rather, the plaintiff asserted that he had not been provided with requested discovery.[3] Hence, the court ordered the plaintiff to re-file his response to the defendants' motion for summary judgment on or before May 1, 2006.

The plaintiff re-filed his response to the defendants' motion on May 1, 2006. However, his response is still deficient. Specifically, the plaintiff's response brief relies almost entirely upon the affidavits of fellow inmates Robert Cloud, Paul Ninham and Albert Biddell. (*See* Pl.'s Response to Def.s' Mot. for Summary Judgment at 1). Pursuant to this court's order of May 20, 2005, the plaintiff was instructed that he could only pursue his claims in an individual capacity and not on behalf of a class. Moreover, the plaintiff lacks standing to challenge the defendants' actions as they concern other Native American inmates. That is, the plaintiff may only assert his own legal rights, not the legal rights of other inmates. *See Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996)(plaintiff may only challenge defendants' actions to the extent he was personally affected). Thus, the affidavits of inmates Biddell, Cloud and Ninham will be

---

[2]The amended complaint, which starts on page nine, is eight pages long. In the interest of simplicity, the court will refer to the amended complaint as it is numbered in the Electronic Case Filing (ECF) system, with the first page of the document being page number 1 and the last page of the document being page number 8.

[3]By order of April 20, 2006, the court addressed the plaintiff's discovery issues.

disregarded. Accordingly, the bulk of the defendants' summary judgment materials must be considered undisputed.

## C. Relevant Undisputed Facts

The plaintiff is a member of the Oneida Tribe of Indians. (Pl.'s Affidavit of November 3, 2005 [Pl.'s Aff.] ¶3). From August 2, 2002, to November 15, 2003, he was housed at Waupun Correctional Institution (WCI). (Affidavit of Linda Alsum-O'Donovan [O'Donovan Aff.] ¶14(c)). Then, on November 13, 2003, the plaintiff was transferred to Redgranite Correctional Institution (RGCI), where he was incarcerated until January 4, 2006. (O'Donovan Aff. ¶14 (d)). On January 5, 2006, the plaintiff was moved to Stanley Correctional Institution (SCI), where he currently resides. (O'Donovan Aff. ¶14(e)).

### DOC Defendants

Matthew Frank is the Secretary of the Wisconsin Department of Corrections (DOC). (Amended Complaint [Compl.] at 2). Cindy O'Donnell is the former Secretary of the DOC. (Defendants' Answer of Nov. 7, 2005 [Answer] at 4). Richard Raemisch is the Deputy Secretary of the DOC. (Answer at 4). John Ray and Sandra Hautamaki are employed as DOC Corrections Complaint Examiners (CCEs). (Compl. at 3).

### WCI Defendants

Defendants McCaughtry, Jess, Muenchow, Tonn, Muraski and Tomasek-Harper were employed at WCI at all times relevant. (Compl. at 3-4; Answer at 5). Gary McCaughtry was the Warden. (Answer at 4). Cathy Jess is a Deputy Warden. (Compl. at 3). James Muenchow is an Inmate Complaint Examiner (ICE). (Compl. at 3). Stanley R. Tonn was

formerly employed as an ICE. (Compl. at 4). Bruce Muraski is the Investigative Captain, Disruptive Groups Coordinator and Security Supervisor 2. (Answer at 5). Gloria Tomasek-Harper is a Recreation Leader-Objective. (Answer at 5).

### RGCI Defendants

Defendants Endicott, Beck, Wess, Timm and Campbell were employed at RGCI at all times relevant. (Compl. at 2-3; Answer at 3; Affidavit of Leo Campbell [Campbell Aff.] ¶2). Jeffrey P. Endicott is the Warden. (Compl. at 2). Steve Beck is the Deputy Warden. (Compl. at 2). Sally Wess is an ICE. (Compl. at 3). Leo Campbell is the Chaplain. (Campbell Aff. ¶2). Kristine Timm's employment responsibilities are in dispute; the plaintiff claims that she was the Religious Supervisor (Compl. at 3), and the defendants assert that she was formerly employed as a Unit Manager. (Answer at 3).

### Internal Management Procedures

The DOC developed and implemented Internal Management Procedures (IMPs) related to religion in order to ensure that incarcerated individuals had opportunities to: (1) pursue lawful religious practices of the religion of their choice; and (2) possess religious property consistent with the institutions' security practices, rehabilitative goals and resources. (Affidavit of Pamela J. Wallace [Wallace Aff.] ¶8). The IMPS are intended to be the least restrictive as reasonably possible, but must be consistent with the institution's security practices and principles, rehabilitative goals, health and safety of inmates and staff, allocation of limited resources, and the responsibilities and needs of correctional institutions and facilities. (Wallace Aff. ¶9).

Internal Management Procedure Number DOC 309-IMP #6 (IMP #6), which concerns religious beliefs and practices for DOC incarcerated offenders, was implemented in April, 2001. (Affidavit of Daniel A. Westfield [Westfield Aff.] ¶7). The Division of Adult Institutions (DAI) Religious Steering Committee, which has been renamed the Religious Practice Advisory Committee, oversaw the revision of IMP #6. *Id*. In revising IMP #6, it was the goal of the Religious Steering Committee to help minimize and alleviate the following problems: (1) the increase in the DOC inmate population; (2) more problematic inmates facing lengthier and life sentences; and (3) an increase in gang activity. (Westfield Aff. ¶¶9-10). In addition, the Religious Steering Committee sought to improve consistency amongst the DOC institutions. (Westfield Aff. ¶11).

Before participating in a religious service or study group or acquiring approved religious property, an inmate must complete a "Religious Preference" form DOC 1090 designating his choice of religion. (Wallace Aff. ¶19). On November 6, 2003, the plaintiff signed a "Religious Preference" form and indicated his religious preference to be Native American. (Campbell Aff. ¶8).

The DOC and the DAI does not validate an inmate's ethnicity or the sincerity of his professed religious beliefs due to limited time, means, resources and ability. (Wallace Aff. ¶19). However, inmates may participate only in congregate services according to their stated preference or with the Chaplain's approval. (Campbell Aff. Ex. 1006). Some special events and activities may be designated open to all inmates regardless of their designation or if they have designated "no religious preference" on the religious preference form. *Id.*

**Non-Smoking Policy**

The plaintiff has alleged that he is not permitted to personally possess a prayer pipe, smoke tobacco or smudge herbs in his cell. (Pl.'s Aff. ¶4). Pursuant to Internal Management Procedure 501.03 (IMP 501.03), RGCI is tobacco and ignition device free. (Campbell Aff. ¶11). The risk of fires, either accidental or intentional, and safety concerns for inmates and staff are the primary purpose for controlling smoking and ignition devices in DOC correctional institutions and facilities. (Westfield Aff. ¶12). A serious fire could result in death or injury to staff and inmates. (Westfield Aff. ¶14). Moreover, the evacuation of a 300 bed cell hall would require staff to release the inmates and search each cell to ensure that all have safely evacuated, which is a monumental task. *Id*.

RGCI's non-smoking policy applies equally to inmates and staff. (Campbell Aff. ¶12). The policy is not intended to hinder any inmate's right to practice his religion. *Id*. Rather, it was intended to provide a healthy, non-pollutant environment for staff and inmates. *Id*.

Although RGCI is a smoke free institution, Native Americans who participate in sweat lodge ceremonies are allowed to smoke and smudge during the sweat lodge ceremonies. (Campbell Aff. ¶27). The sweat lodge ceremony is observed outdoors because it involves a fire, smoking and smudging. (Affidavit of Scott M. Eckstein [Eckstein Aff.] ¶4). For health and safety reasons, nothing can be burned in individual inmate cells. (Campbell Aff. ¶29). All smoking materials must be under the control of the Chaplain. *Id*.

Smudging, which is the burning of Native American medicines, is prohibited indoors because it creates a health and safety risk to other inmates and staff. (Westfield Aff. ¶15). The smoke and odors produced during smudging can cause or aggravate allergies, respiratory problems, and irritation to the eyes. *Id.* Further, smudging is especially intrusive given the close living quarters, overcrowded conditions and frequency of double-celled inmates. *Id.* All smudging materials are also kept under the control of the Chaplain. (Campbell Aff. ¶29).

**Cultural Activity Group**

The plaintiff has asserted that the defendants have prevented him from forming a Native American cultural activity group. (Pl.s' Aff. ¶10). Pursuant to RGCI IMP 501.03 and IMP # 6, all religious services and study groups must be led by a qualified person of that particular umbrella group, such as a Chaplain, an approved outside spiritual advisor, an approved community volunteer, or an electronic medium if no qualified person is available. (Westfield Aff. ¶17). RGCI inmates are not allowed to lead or conduct religious services or study groups. (Campbell Aff. ¶36).

Prior to the implementation of IMP #6, some correctional institutions allowed inmate led religious groups when an outside spiritual leader or volunteer was not available. (Westfield Aff. ¶18). In the institutions that did allow inmates to lead religious groups, there were various security problems, including some serious incidents, with inmates lead groups of inmate leaders being disrespectful or defiant to staff. *Id.* The Religious Steering Committee revised the policy of allowing inmates to lead religious groups for the following reasons: (1) the

most basic responsibility of a correctional institution is the protection of staff, inmates and members of the public; (2) allowing inmates to lead, have power over, or be "in charge" of a group or groups of inmates violates fundamental security tenets; (3) placing inmates in "quasi" staff or community volunteer status disrupts the power dynamics in a prison because placing inmates in a position of authority over other inmates blurs the necessary distinction between staff and inmates; (4) inmates are not allowed to lead groups in other treatment programs or activities; (5) DOC historically has had problems with gangs taking over religious groups and making the groups covers for gang activity; (6) allowing inmates to lead such groups empowers gang leaders in such situations, which increases the potential for strong-arming, violence, introduction of contraband, group resistance and coordinated gang activities; and (7) gang activity becomes much more difficult to monitor and control with inmate led groups. (Westfield Aff. ¶19).

In May, 2004, the plaintiff's request to meet as a Native American cultural activity group was denied by defendant Endicott. (Compl. at 6). His request was denied because the limited physical space and staff resources at correctional institutions cannot accommodate requests for inmates of many different cultures and ethnicities to meet as a group. (Westfield Aff. ¶46). In addition, inmate groups that promote ethnicity have been known to cloak prohibited groups and activities as religious in nature. (Wallace Aff. ¶5).

The plaintiff has never asked the Chaplain to designate someone to be a "group pipe bearer." (Campbell Aff. ¶38). If he had, the Chaplain would have advised him that

inmates are not allowed to lead any group activity, nor are they allowed to participate in the decision related to volunteer religious advisors. *Id.*

### Drum Practice

The plaintiff has asserted that he is prevented from participating in a drum "ceremony" because he is not allowed to smudge during drum practice. (Pl.'s Aff. ¶8). Native American inmates are only permitted to smudge under the supervision of the Native American Spiritual Advisor. (Campbell Aff. ¶43). The Chaplain cannot lead a drum ceremony without the Native American spiritual advisor because he does not have the knowledge and expertise in Native American customs and traditions. (Campbell Aff. ¶56). A weekly drum ceremony, during which inmates are permitted to smudge, is not possible because of the Spiritual Advisor's limited availability. (Campbell Aff. ¶55). However, RGCI inmates are allowed to participate in a drum practice on Tuesday mornings from 8:30 to 9:30 a.m. *Id.* During this event, the inmates practice on the drums by listening to cassettes and learning songs while beating the drums. *Id.*

### Sweat Lodge Ceremonies

The plaintiff has asserted that he is not given time to complete the sweat lodge and that defendant Campbell desecrated the sweat lodge area on two occasions. (Compl. at 7). RGCI holds sweat lodge ceremonies for Native American inmates once a month. (Campbell ¶22). The sweat lodge ceremony at RGCI is conducted under the supervision of the Native American Spiritual Advisor. (Campbell Aff. ¶46). Either the Chaplain or another RGCI staff member must be present to supervise inmates during the sweat lodge ceremony, because it

would be contrary to institution policy to leave inmates unsupervised by staff, even though a Spiritual Advisor is also present. (Campbell Aff. ¶20).

Under the Chaplain's supervision and direction, the inmates begin to prepare for the sweat lodge at approximately 6:30 in the morning on the day of the sweat lodge. (Campbell Aff. ¶23). The Spiritual Advisor is generally not able to come to the institution until approximately 8:40 a.m. due to his full time job. (Campbell Aff. ¶24). Once he arrives, the inmates gather around the Sweat lodge for 15 to 20 minutes. *Id.* At approximately 9:00 a.m., the inmates are allowed to enter the sweat lodge. (Campbell Aff. ¶25). As long as the Chaplain or other DOC staff are supervising inmates, any inmate may tend to the sweat lodge fire. (Campbell Aff. ¶33).

The inmates sweat for approximately one and a half hours and then come out and smoke the ceremonial pipe. (Campbell Aff. ¶25). After each inmate has smoked the pipe, they shake hands. *Id.* The sweat lodge generally ends between 10:30 a.m and 10:45 a.m. (Campbell Aff. ¶26).

The inmates must be back in their housing units for head count, which is conducted at approximately 11:00 a.m. (Campbell Aff. ¶54). The head counts are necessary to maintain the security of the institution and safety of staff, inmates and the community. *Id.* Counts are also necessary to ensure that inmates are alive and well. (Westfield Aff. ¶47).

The Spiritual Advisor is only available to come to the institution for the sweat lodge ceremonies and for the yearly feast. (Campbell Aff. ¶¶ 46, 53). The Spiritual Advisor

has not requested additional time for the sweat lodge ceremony. *Id.* If he could come earlier, additional time would be granted for the ceremony. *Id.*

Defendant Campbell has never intentionally or maliciously desecrated the sacred sweat lodge fire. (Campbell Aff. ¶74). However, Campbell recalls an incident in November, 2004, when he inadvertently placed his foot on a rock near the sacred fire during the Sweat lodge ceremony. (Campbell Aff. ¶75). In addition, in January, 2004, defendant Campbell remembers that he stood close to the sweat lodge fire for warmth. (Campbell Aff. ¶76).

**Religious Feasts**

The plaintiff has complained that he is being denied religious feasts and ceremonial foods. (Pl.'s Aff. ¶5). A religious feast is a celebration or ceremony in which food plays a religiously significant part. (Westfield Aff. ¶20). IMP #6 formalized the practice some institutions already had of providing one feast per year per religious umbrella group. *Id.* This means that a group of inmates can gather in one room and eat foods from the institution kitchen and have a religious observance of some kind. *Id.* The policy of allowing only one religious feast per year was necessary due to staff resources and available space. (Westfield Aff. ¶22). Further, security concerns come into play any time inmates gather together in a group. *Id.*

Religious feasts can also be a burden on an institution's food service staff, since it takes extra time to serve food in locations other than the institution kitchen. *Id.* For example the food for the feast usually has to be kept separate, maintained at appropriate temperatures, and served separately for either delivery to what is typically not a dining room area, or it has to be served separate from the regular meal service. (Westfield Aff. ¶26). In addition,

Case 2:05-cv-00234-RTR   Filed 09/06/06   Page 14 of 45   Document 95

arrangements for the feast must be made and coordinated by staff, notification of inmates approved to attend must be sent out, notification of approved outside religious visitors must be sent out, outside religious visitors must be screened and processed into the institution, and usually additional security staff have to be made available to supervise the group gathering. *Id*.

Religious feasts consist of the regular institution meals or special religious diet meals prepared by the institution. (Westfield Aff. ¶28). No outside food is allowed into the institution for religious feasts or other special events involving a meal for inmates. *Id*. There are two primary reasons for not allowing outside food to come into the institution: (1) it is very difficult to search incoming food effectively for contraband such as drugs or weapons; and (2) the institution would not know the sanitary or possibly unsanitary conditions that food had been prepared in, whether or not appropriate temperatures had been maintained during transport to RGCI, and the difficulty of maintaining appropriate temperatures after delivery to RGCI. *Id*. If there were any cases of food poisoning, the state would be responsible for providing medical care and could face potential litigation. *Id*.

Although inmates of the same religion may only eat together once a year to celebrate a "religious feast," they are not prevented from celebrating their beliefs in the following ways: (1) a special congregate service; (2) religious diet request; (3) individual study; (4) personal meditation; (5) utilization of religious books and property; (6) individual religious observance in their living quarters; (7) correspondence with fellow believers; (8) pastoral visits; (9) additional foods meeting religious dietary principles purchases in the institution canteen; and (10) requesting to abstain from work or programs. (Westfield Aff. ¶29).

**Religious Property**

The plaintiff has contended that he is denied the use of a personal prayer pipe. (Pl.'s Aff. ¶4). The DOC developed and implemented IMP # 6A, entitled "Religious Property," to ensure that inmates have opportunities to possess religious items as personal property. (Wallace Aff. ¶13; Westfield Aff. Ex. 1003). Religious property items, which become part of an inmate's inventories personal property, are subject to the normal considerations of safety and security. *Id*. That is, inmates are permitted to possess approved religious property associated with their designated religious preference unless the items present a threat to the order and safety of the institution. (Wallace Aff. ¶15).

Inmates may request religious property items by using a DOC-2075 form entitled "Request for New Religious Practice." (Wallace Aff. ¶5). In light of the hundreds of different religions and religious sects practiced by Wisconsin inmates, there are innumerable potential "religious" property items and variations of currently approved religious property items. (Wallace Aff. ¶6). It was important for DOC to restrict the number of personal property items when revising IMP #6A because of the collective impact on the institution's security,

management and resources. *Id.*[4] The need to control the amount of property is also related to health and safety concerns such as the potential for fire hazards and concerns about roommate relations if cells or rooms become overcrowded. (Wallace Aff. ¶18).

Under IMP #6A, all property items associated with the sweat lodge and inmate participation in the sweat lodge are stored in the Chaplain's office. (Campbell Aff. ¶29). The pipe and pipe materials are stored in the Chaplain's office because the RGCI ceremonial pipe belongs to the group and may not be possessed by any one inmate. (Campbell Aff. ¶63). Furthermore, any request by an inmate for a personal pipe or pipe bag would not be granted because RGCI is currently smoke free. (Wallace Aff. ¶32).

Native American inmates, including the plaintiff, are allowed to personally possess a medicine bag in their cell. (Campbell Aff. ¶67). Pursuant to IMP #6A, the bag must

---

[4]The procedures involved in managing inmate property include: (1) the inmate must complete a form to request staff approval to purchase the property item; (2) the staff member must review the request and approve or deny it consistent with applicable code provisions; (3) staff must ensure that the inmate has sufficient inmate account funds to purchase the item; (4) staff in the business office must process the approved form including issuing a check to the company from which the item is ordered; (5) the order and check are mailed out and go through the mail room staff; (6) when the property item comes in, it comes into the mailroom and property room and is handled by staff; (7) the item has to be checked-in to ensure there is no contraband (this includes the property being x-rayed); (8) there is a determination if the property meets the DOC 309 property IMP requirements (allowable item including all of the specifications in the IMP for an allowable item such as size, features, color, etc.); (9) if the property item is not allowed, then it is has to be held until the inmate decides whether or not to file an inmate complaint; (10) if the property is not allowed or the inmate decides it is unacceptable (it does not fit, poor quality, etc.), then the item has to be repackaged and returned to the company for a refund; (11) if it is accepted for return by the company, and a refund check is issued, this is sent to the institution and is processed by the mail room staff and ultimately by the staff in the business office who deposit it in the inmate's account; (12) if the item is allowed into the institution, the item must be added to the inmate's property inventory by property staff; (13) the item must be transported to the inmate's housing unit and unit officer staff must have a record of the addition to the inmate property inventory; (14) if the new property puts an inmate over the allowable property amount, the current property item(s) has to be packed up for mailing out and must be taken off the inmate's property list; (15) any time an inmate is released or transferred, each item of property must be inventoried and packed prior to the release or transfer in an effort to ensure it is not broken, it is the inmate's property, the inmate's property is within allowable limits, etc.; (16) if the inmate is transferred, the property must be unpacked and re-inventoried after the inmate arrives at the new institution to ensure that nothing has been lost or broken while it was under staff control; and (17) specific to religious property items, the institution chaplain or religious leader could be contacted and consulted at various points in the above process. *Id.*

-17-

be three inches or smaller.  *Id.*[5]  In addition to the medicine bag, inmates are allowed to possess 1 braid of sweetgrass, 1/4 cup sage, 1/4 cup cedar, and other Native American property items such as religious books and publications and an eagle or a red tail feather.  (Westfield Aff. ¶33). RGCI inmates may also possess up to 25 religious publications or books in their cell at any given time.  (Campbell Aff. ¶17).

Native American medicines can be considered an item of value, which if allowed in large quantities can be stolen, traded or altered.  (Westfield Aff. ¶38).  It could also create jealousy and animosity among inmates, creating climate and control issues for staff.  *Id.*  Such hostility can lead to inmates acting out against other inmates with threats and acts of violence creating a serious security threat to institutions for both staff and inmates.  *Id.*  Native American medicines such as sweetgrass, cedar and sage are flammable and it is necessary to limit such materials in inmate cells to preserve the health and safety of the inmates and staff.  (Westfield Aff. ¶39).

Tobacco is considered contraband at DOC institutions because it creates risks to the safety and security of the institution.  (Westfield Aff. ¶ 40).  Thus, Native American inmates may not possess tobacco in their cells.  *Id.*  Because of its contraband status, the value of tobacco is equivalent to that of marijuana in the prison environment.  *Id.*

RGCI inmates may own jewelry as long as it conforms to the institution's property rules.  (Campbell Aff.¶71).  Headbands, ribbon shirts, looms and rattles are not allowed property

_____

[5]In placing restrictions on the allowable amounts of Native American medicines and other religious property, the DOC Inmate Property Committee solicited input from Bernie Stevens, a Native American who has advised DOC in the past on Native American religious issues. (Westfield Aff. ¶34).  The committee sought and relied upon Mr. Stevens' endorsement in establishing the volume limits for Native American medicines in IMP #6A.  *Id.*

items because these items could create security and safety issues in a correctional institution. (Campbell Aff. ¶73; Westfield Aff. ¶42). Beads used in headbands and jewelry could be used to make a crude weapon. *Id.* Beads and jewelry could also be fashioned into a key capable of unlocking handcuffs. *Id.* Further, metal jewelry, beads or spacers could be melted down to create unauthorized objects such as edged weapons, keys and badges. *Id.* Ribbons shirts, jewelry, looms, shells and rattles create a security concern due to the possibility of items being hidden with the objects. (Westfield Aff. ¶43). Finally, headbands and ribbon shirts could be used to conceal an inmate's identity, which could facilitate escape. (Westfield Aff. ¶43).

Native American inmates may use an abalone shell during the sweat lodge ceremony. (Campbell Aff. ¶69). However, the shell is stored in the Chaplain's office and may not be personally owned by any individual inmate. (Campbell Aff. ¶70).

### Exhaustion of Administrative Remedies

On October 17, 2003, the plaintiff signed Inmate Complaint Number WCI-2003-35042, complaining that twenty tribal newspapers and other personal property items were strewn about his cell. (O'Donovan Aff. ¶17; Ex. 1004). Subsequently, on October 29, 2003, defendant Muenchow rejected the complain because the allegations within were outside the scope of the ICRS. (O'Donovan Aff. Ex. 1004). The plaintiff was advised that he could appeal the rejected complaint within 10 days by completing a DOC 2182 Request for Review of Rejected Complaint and submitting it to the warden (O'Donovan Aff. Ex. 1004 at 6). The plaintiff did not appeal the rejection of Inmate Complaint Number WCI-2003-35042. (O'Donovan Aff. ¶20).

On September 3, 2003, the plaintiff filed Inmate Complaint Number WCI-2003-29940, alleging that his eagle feather had been damaged. (O'Donovan Aff. ¶¶21-22; Ex. 1005). On the same date, defendant Tonn rejected the complaint as untimely. *Id*. The plaintiff appealed the rejection to defendant Jess, who affirmed Tonn's decision. *Id*.

On October 23, 2003, the plaintiff filed Inmate Complaint Number WCI-2003-35229, asserting that he was forced to destroy some hobby items. (O'Donovan Aff. ¶23; Ex. 1008). On the same date, defendant Muenchow rejected the complaint as being moot. Id. The plaintiff appealed the rejection on November 19, 2003. *Id*. On the same date, the WCI reviewing authority rejected the appeal as untimely. *Id*.

## II. DISCUSSION

### A.    Exhaustion of Administrative Remedies

The defendants argue that the plaintiff failed to exhaust his administrative remedies with respect to the inmate complaints he filed during his incarceration at WCI. The Prisoner Litigation Reform Act of 1995 (PLRA), Pub. L. 104-134, 110 Stat. 1321 (1996), provides that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997(e)a. Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The Inmate Complaint Review System (ICRS) within the Wisconsin prisons is the administrative remedy available to inmates with complaints about prison conditions or the actions of prison officials. Wis. Admin. Code § DOC 310.01(2)(a). The Wisconsin Administrative Code specifically provides that before an inmate may commence a civil action, the inmate shall exhaust all administrative remedies that the Department of Corrections has promulgated by rule. Wis. Admin. Code § DOC 310.05. The ICRS is available for inmates to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1).

In order to use the ICRS, an inmate must file a complaint with the inmate complaint examiner with fourteen days after the occurrence giving rise to the complaint. Wis. Admin. Code §§ DOC 310.07(1) and 310.09(6). Complaints filed by an inmate or a group of inmates shall contain only issue per complaint and shall clearly identify the issue. Wis. Admin. Code DOC §§ 310.09(1) and 310.09(1)(e). Prior to accepting the complaint, the Inmate Complaint Examiner may direct the inmate to attempt to resolve the issue. Wis. Admin. Code DOC § 310.09(4). After reviewing and acknowledging each complaint in writing, the inmate complaint examiner either rejects the complaint or sends a recommendation to the "appropriate reviewing authority." Wis. Admin. Code §§ DOC 310.11(2) and 310.11(11). The appropriate reviewing authority makes a decision within ten days following receipt of recommendation. Wis. Admin. Code § DOC 310.12(1). Within ten days after the date of the decision, a complainant dissatisfied with a reviewing authority decision may appeal that decision by filing a written request for review with the corrections complaint examiner. Wis. Admin. Code § DOC

310.13(1). The corrections complaint examiner reviews the appeal and makes a recommendation to the Secretary of the Department of Corrections. Wis. Admin. Code § DOC 310.13(6). The Secretary may accept, adopt, or reject the correction complaint examiner's recommendation, or return the appeal to the corrections complaint examiner for further investigation. Wis. Admin. Code § DOC 310.14(2).

### Inmate Complaint Number WCI-2003-35042

In this case, it is undisputed that the plaintiff failed to timely appeal the rejection of Inmate Complaint Number WCI-2003-35042. *See* DOC § 310.11(6)(an inmate may appeal a rejected complaint within 10 calendar days only to the appropriate reviewing authority who shall only review the basis for the rejection of the complaint). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 126 S. Ct. 2378, 2382 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require."). This the plaintiff has failed to do. Accordingly, he did not exhaust his administrative remedies with respect to Inmate Complaint Number WCI-2003-35042.

### Inmate Complaint Number WCI-2003-29940

It is undisputed that Inmate Complaint Number WCI-2003-29940 was rejected as untimely. Although the plaintiff filed a timely appeal to the appropriate reviewing authority, the reviewing authority affirmed the rejection of the complaint as untimely. An inmate

complaint may be rejected if it is submitted beyond fourteen calendar days from the date of the occurrence giving rise to the complaint. Wis. Admin. Code DOC § 310.11(5).

Prison regulations provide that inmate complaints submitted later than fourteen days after the event may be accepted for good cause. Wis. Admin. Code § DOC 310.09(6). However, the fact that the state has the discretion to entertain untimely filed inmate complaints and appeals does not mean that such filings constitute "exhaustion," for "this position would leave § 1997e(a) without any oomph." *Pozo,* 286 F.3d at 1025. Thus, the plaintiff failed to exhaust his administrative remedies as to Inmate Complaint Number WCI-2003-29940.

### Inmate Complaint Number WCI-2003-35229

It is undisputed that Inmate Complaint Number WCI-2003-35229 was rejected as moot pursuant to Wis. Admin. Code DOC 310.11(5)(f). The plaintiff then made an untimely appeal of the rejection pursuant to DOC § 310.11(6). As noted, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo,* 286 F.3d at 1025. The plaintiff failed to do this when he filed an untimely appeal of his rejected complaint. Thus, he has failed to exhaust his administrative remedies with respect to Inmate Complaint Number WCI-2003-35229.

In sum, the undisputed facts establish that the plaintiff failed to exhaust administrative remedies with respect to the inmate complaints he filed during his incarceration at WCI. Thus, all of the plaintiff's claims against WCI will be dismissed. In addition, the WCI defendants (McCaughtry, Jess, Muraski, Tomasek-Harper, Muenchow and Tonn) will also be dismissed from this action.

-23-

**B.    Analysis**

The plaintiff is a member of the Oneida Tribe of Indians. He has alleged that his rights under the First Amendment and RLUIPA were violated in the following ways: (1) he is not permitted to smoke or smudge in his cell; (2) he is not provided adequate time to complete the sweat lodge; (3) defendant Campbell desecrated the sweat lodge; (4) he may not smudge during drum practice; (5) he is denied a weekly pipe ceremony; (6) he is prohibited from forming a Native American cultural activity group; (7) he was denied religious feasts and traditional foods; (8) he may not possess traditional regalia; and (9) non-Native American inmates are allowed to participate in Native American religious activities. (Compl. at 5-6).

**1.    RGCI's Smudging and Smoking Policy**

The plaintiff contends that his exercise of religion has been burdened because he is not allowed to personally possess a prayer pipe and smoke tobacco in his cell. RLUIPA prohibits governmental imposition of a "substantial burden on the religious exercise" of an inmate, unless the defendant can show that the burden is: (1) in furtherance of a compelling governmental interest; and (2) is the lest restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a). By contrast, a prison regulation challenged on First Amendment grounds will be upheld if it is reasonably related to a legitimate penological interest. *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004). Because the defendants have a heavier burden under RLUIPA, the court will first consider the plaintiff's statutory claim. If the defendants meet their burden under RLUIPA, they will meet the less stringent burden of

showing that their conduct was reasonably related to a legitimate penological interest under the First Amendment.

Before addressing the merits of the plaintiff's statutory claim, the protections afforded by the Religious Land Use and Institutionalized Persons Act apply where

(1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or

(2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

42 U.S.C. § 2000cc-1(b). Because the DOC receives and uses federal grant money for state prison facilities, the requirements of the RLUIPA apply to it. *Lindell v. McCallum,* 352 F.3d 1107, 1109-10 (7th Cir. 2003)(citing *Charles v. Verhagen*, 348 F.3d 601, 606 (7th Cir. 2003)).

To show that his rights under the RLUIPA were violated, the plaintiff must first establish that the defendants' actions create a substantial burden on the exercise of his religious beliefs. 42 U.S.C. § 2000cc-2(b); *Hernandez v. Commissioner,* 490 U.S. 680 (1989). If a plaintiff makes a showing that his religious exercise has been substantially burdened, the defendant must come forward with evidence demonstrating that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709 (2005) Although RLUIPA does not define the term "substantial burden," the Court of Appeals for the Seventh Circuit has held that a substantial burden is "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise...effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). Under the statute, a "religious exercise" is "any exercise of

-25-

religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).[6]

Pursuant to IMP 501.03, RGCI is a smoke and ignition device free institution. Therefore, inmates are not allowed to burn anything in their cells. While Native American inmates may personally possess a small amount of medicinal herbs for religious reasons, they may not personally possess a prayer pipe or tobacco. Native American inmates are only permitted to smoke tobacco and use the prayer pipe at the monthly sweat lodge ceremony. The sweat lodge materials, such as the prayer pipe and tobacco, must be kept under the control of the Chaplain. Based on the generous description of "substantial burden," the court finds that the plaintiff has made a colorable claim that the defendants' non-smoking regulation substantially burdens his exercise of religion.

The defendants, however, have met their burden of justification by showing a compelling state interest in imposing the burden about which the plaintiff complains. First, the defendants have cited several health and safety related reasons in support of their policy against smoking. Smoking and smudging present a safety issue due to the possibility of fire Specifically, a serious fire could result in death or injury to staff and inmates. Moreover, the evacuation of a 300 bed cell hall would require staff to release the inmates and search each cell to ensure that all have safely evacuated, which is a monumental task.

---

[6]The court assumes for the purposes of this litigation at its current stage that the plaintiff is a member of bona fide religion and he is sincere in his beliefs. *See Cutter v. Wilkinson*, 544 U.S. 709, 722 n.13 ("Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion...the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity.").

Case 2:05-cv-00234-RTR    Filed 09/06/06    Page 26 of 45    Document 95

The defendants have also presented several health and safety related reasons for requiring all smoking materials to be under the control of the Chaplain. For example, a pipe can conceal contraband, create hostility among inmates and increase the possibility of bartering, trading, stealing and strong-arming. The value of tobacco is equivalent to that of marijuana in the prison environment and allowance of tobacco for some inmates' personal use necessarily creates a greater risk of inmate bartering, trading, stealing, and strong-arming. Allowance of tobacco would also create jealousy and animosity among inmates, hostile environments, risk of threats and acts of violence, and a serious security threat to institutions for both staff and inmates.

Maintaining safety and order in prisons is a compelling governmental interest, and one that frequently requires and so justifies limitations on freedom of religious conduct. *Bell v. Wolfish*, 441 U.S. 520, 546 (1979); *Mack v. O'Leary*, 80 F.3d 1175, 1180 (7th Cir. 1996). To this extent, the Supreme Court has noted that,

> "Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing the necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'"

*Cutter*, 544 U.S. at 722-23 (internal citations omitted).

In *Orr v. Morgan*, Case No. 01-C-1103 (E.D. Wis. Mar. 27, 2003) (unpublished opinion), United States District Judge Lynn Adelman conducted a thorough analysis of a non-smoking ban in a DOC institution and held that it survives scrutiny under RLUIPA. The plaintiff, a Native American inmate, alleged that the DOC's ban on the possession and smoking

of tobacco in cells violated his rights under RLUIPA. In granting the defendants' motion for summary judgment, Judge Adelman held that while the defendants' policy posed a substantial burden on the plaintiff's exercise of religion, the defendants met their burden of showing that the non-smoking policy facilitated a compelling state interest in maintaining safety and order.

Similarly, in this case the plaintiff has challenged a policy that was enacted to ensure the health and safety of the institution. Specifically, the defendants are concerned that allowing smoking and personal possession of prayer pipes and tobacco could increase the risk of fire, inmate hostility, and inmate violence. Further, there is no evidence before the court that the defendants have not utilized the least restrictive means available to further these compelling interests. Consequently, the court finds that the defendants did not violate the plaintiff's rights under RLUIPA.

### 2.    Sweat Lodge Ceremonies

The plaintiff claims that Native American inmates are not provided enough time to complete the sweat lodge. Further, he asserts that defendant Campbell desecrated the sweat lodge area.

In the present case, the following facts are undisputed. RGCI holds sweat lodge ceremonies for Native American inmates once a month. Sweat lodge ceremonies are conducted under the supervision of the Native American volunteer. Generally, the volunteer is not able to come to the institution until approximately 8:40 a.m. due to his full-time job. Under defendant Campbell's supervision and direction, the inmates begin to prepare for the sweat lodge at approximately 6:30 a.m. on the morning of the sweat lodge.

Once the volunteer arrives, the inmates are allowed to gather around the sweat lodge for fifteen to twenty minutes. Then, at approximately 9:00 a.m. the inmates enter the sweat lodge. They generally sweat for about an hour and a half and then come out and smoke the ceremonial pipe. After each inmate has smoked the pipe, they shake hands. The sweat lodge ceremony is generally over between 10:30 a.m. and 10:45 a.m. so that the inmates can be escorted back to their units for scheduled head count.

The plaintiff has not submitted any evidence demonstrating how the defendants' arrangements for the sweat lodge ceremony are inadequate. Nor has he indicated how much additional time he would need to properly complete the sweat lodge ceremony. Indeed, the only information he has provided is that, "RGCI policy allows the Sweat-Lodge ceremony, but will not create more needed time so that the Native American Indian prisoners can fully complete the Sweat-Lodge Ceremony." (Pl.'s Mot. for Preliminary Injunction at 5). At the summary judgment stage, however, neither party may rest on mere allegations in the pleadings, *Anderson*, 477 U.S. at 248, or upon such conclusory statements in affidavits. *Palucki,* 879 F.2d at 1572. Therefore, it is doubtful that the time limits the defendants have placed on the sweat lodge are a substantial burden on the plaintiff's exercise of religion.

Regardless, the defendants have demonstrated that they have a compelling governmental interest in placing a time limit on the sweat lodge. Namely, the sweat lodge has to end at approximately 10:30 a.m. so that inmates can be back in their cells for count at 11:00 a.m. Counts serve as a wellness check to ensure that inmates are alive and well. Counting

procedures are also necessary to ensure round the clock accountability of inmates entrusted to the care and custody of the DOC.

As discussed, maintaining safety and order in prisons is a compelling governmental interest. *Mack*, 80 F.3d at 1180. In addition, there is no evidence in the record that the defendants have not utilized the least restrictive means possible to further their compelling interests. Thus, this claim fails under RLUIPA.

The plaintiff next asserts that defendant Campbell desecrated the sweat lodge on two occasions. It is undisputed that in November, 2004, Campbell accidentally placed his foot on a rock near the sacred fire during a sweat lodge ceremony. Then, in January, 2004, defendant Campbell stood close to the sweat lodge fire for warmth.

The plaintiff has given no indication as to how defendant Campbell's actions presented a substantial burden on the plaintiff's ability to exercise his religion. Regardless, it is undisputed that the Campbell did not act intentionally when he placed his foot on a rock and stood close to the sweat lodge fire. To the extent that the plaintiff advances a claim based on Campbell's inadvertent conduct, his allegations amount only to negligence. Negligence, however, is not enough to sustain a claim under 42 U.S.C. § 1983. *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996). Consequently, defendant Campbell's actions do not implicate RLUIPA.

**3.      Weekly Drum Practice**

The plaintiff asserts that because the defendants prohibit smudging at the drum practice, he is prevented from celebrating the drum ceremony. Native American inmates are

-30-

only permitted to smudge under the supervision of a qualified person, such as a Native American Spiritual Advisor who comes to RGCI on a monthly basis. The Native American Spiritual Advisor is not available on a weekly basis due to his full time employment. Thus, Native American inmates are allowed to participate in a weekly drum practice, as opposed to a drum ceremony. During this event, the inmates practice by listening to cassettes and learning songs while beating drums. The drum practices are held every Tuesday morning from 8:30 a.m. to 9:30 a.m.

The defendants assert that the lack of smudging at weekly drum practice does not substantially burden the plaintiff's religious exercise. Specifically, they point out that: (1) the plaintiff is permitted to smudge during sweat lodge ceremonies; (2) he is allowed to possess a medicine bag and limited quantities of medicinal herbs; (3) he is provided with other opportunities to individually practice his religious faith through individual study, personal meditation, religious books and literature, approved religious property, pastoral visits, correspondence with fellow believers, and other approved individual religious observances in his living quarters; and (4) he is allowed to engage in a weekly drum practice even though no Native American religious volunteer is available to conduct a drum ceremony.

As discussed, a substantial burden is "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise...effectively impracticable." *Civil Liberties for Urban Believers,* 342 F.3d at 761. Based on the limited information that has been submitted to the court concerning drum ceremonies, it would appear that the primary

purpose of the ceremony is to participate in drumming.  In this case, the plaintiff is permitted to attend drum practice on a weekly basis.

However, the plaintiff asserts that being prevented from smudging medicinal plants "defeats the purpose and religious meaning within the use of the Drum."  (Compl. at 5). Therefore, drawing all inferences in favor of the plaintiff, the court will assume for the purposes of this order that by refusing to allow smudging during the drum practice, the defendants forced the plaintiff to refrain from observing a tenet of his religion.  Thus, the court will next examine whether a compelling government interest underpinned the alleged conduct and whether the defendants utilized the least restrictive means to further any such interest.

The defendants have advanced several reasons for denying Native American inmates the opportunity to smudge at their weekly drum practices.  First, they assert that they have limited resources because defendant Campbell cannot oversee a drum ceremony due to his lack of religious training and the Native American volunteer cannot supervise the drum ceremony due to his employment schedule.

Second, they submit that a Native American inmate may not lead a drum ceremony because: (1) the most basic responsibility of a correctional institution is the protection of staff, inmates and members of the public; (2) allowing inmates to lead, have power over, or be "in charge" of a group or groups of inmates violates fundamental security tenets; (3) placing inmates in "quasi" staff or community volunteer status disrupts the power dynamics in a prison because placing inmates in a position of authority over other inmates blurs the necessary distinction between staff and inmates; (4) inmates are not allowed to lead groups in other

treatment programs or activities; (5) DOC historically has had problems with gangs taking over religious groups and making the groups covers for gang activity; (6) allowing inmates to lead such groups empowers gang leaders in such situations, which increases the potential for strong-arming, violence, introduction of contraband, group resistance and coordinated gang activities; and (7) gang activity becomes much more difficult to monitor and control with inmate led groups.

Finally, the defendants contend that smudging is prohibited indoors because it creates a health and safety risk to other inmates and staff. The smoke and odors produced during smudging can cause or aggravate allergies, respiratory problems, and irritation to the eyes. Further, smudging is especially intrusive given the close living quarters, overcrowded conditions and frequency of double-celled inmates.

The Supreme Court has held that "context matters" in determining whether the defendants have established a compelling government interest. *Cutter*, 544 U.S. at 722-23. Here, the defendants have submitted evidence that they have limited resources to permit Native American inmates to participate in smudging on a weekly basis, that allowing an inmate to lead a drum ceremony during which smudging occurs would jeopardize their interests in maintaining security and order, and that smudging indoors presents health and safety issues. For these reasons, the court finds that the defendants have demonstrated a compelling interest in refusing to allow Native American inmates to smudge during the weekly drum practice. In addition, there is no evidence that the defendants have not imposed this interest in the least restrictive way possible. Indeed, they have procured the services of a Native American volunteer, although

not to the extent the plaintiff desires. This alone, however, cannot support a finding that the plaintiff's has been prevented from exercising his religion. See *Frederick v. Murphy*, 1993 U.S. App. LEXIS 411 (7th Cir. Dec.14, 1992)(it is not sufficient for plaintiff to show that he preferred more opportunities to meet with other followers of his religion)(unpublished opinion). Thus, the plaintiff cannot prevail on a claim under RLUIPA.

    **4.    Pipe Ceremonies**

        The plaintiff contends that the defendants do not allow Native American inmates to participate in a weekly pipe ceremony. It is undisputed that Native American inmates are only permitted to participate in the pipe ceremony under the supervision of a qualified person, such as a Native American Spiritual Advisor who comes to RGCI on a monthly basis. The Native American Spiritual Advisor is not available on a weekly basis due to his full time employment. Therefore, Native American inmates are allowed to smoke the ceremonial pipe during the sweat lodge ceremony.

        The plaintiff alleges that the defendants prevent Native American inmates from participating in a weekly pipe ceremony. The defendants have asserted that the restriction is justified for the same reasons they deny the plaintiff the opportunity to celebrate a weekly drum ceremony. Namely, that they lack resources and that allowing an inmate to lead the group would jeopardize institutional security and order. In addition, the plaintiff is permitted to observe his religion in multiple other ways. For example, he may celebrate his religious beliefs in the following ways: (1) a special congregate service; (2) religious diet request; (3) individual study; (4) personal meditation; (5) utilization of religious books and property; (6) individual

religious observance in their living quarters; (7) correspondence with fellow believers; (8) pastoral visits; (9) additional foods meeting religious dietary principles purchases in the institution canteen; and (10) requesting to abstain from work or programs.

In *Wilson v. Moore*, 270 F. Supp. 2d 1328 (N.D. Fla. 2003), the plaintiff alleged that the defendants violated his free exercise rights when only one pipe ceremony was held at the institution in approximately five years. The court held that the defendants made a reasonable effort to obtain the services of a volunteer to oversee a pipe ceremony. *Id.* However, their failure to obtain someone to supervise the pipe ceremony was not fatal because:

> defendants do not have an obligation to hire a minister of every faith to conduct religious services for prisoners. Nor do they have the obligation to drum up volunteers. It is enough if they do not impede a prisoner's efforts to have contacts with someone from the outside who is willing to bring an important religious ceremony into the prison.

*Id.*

Similarly, in the present case the defendants have made arrangements for Native Americans to participate in a monthly pipe ceremony under the supervision of the Native American Spiritual Advisor. While the Native American Spiritual Advisor is not available on a weekly basis, the plaintiff is permitted to participate in other daily and weekly religious activities, such as daily personal meditation and weekly drum practices. The defendants are not required to do "handsprings to accommodate the religious needs of inmates." *Mack*, 80 F.3d at 1180. Accordingly, the court is persuaded that the plaintiff has failed to demonstrate that denial of weekly pipe ceremony constitutes a substantial burden on the exercise of his religion. Hence, the plaintiff's rights under RLUIPA have not been impinged.

5.      **Native American Cultural Activity Group**

The plaintiff avers that he has been prevented from forming a Native American cultural activity group.  It is undisputed that in May, 2004, the plaintiff's request to meet as a Native American cultural activity group was denied by defendant Endicott.  Inmate groups that promote ethnicity are generally not allowed at RGCI because they pose numerous security problems.  Specifically: (1) the most basic responsibility of a correctional institution is the protection of staff, inmates and members of the public; (2) allowing inmates to lead, have power over, or be "in charge" of a group or groups of inmates violates fundamental security tenets; (3) placing inmates in "quasi" staff or community volunteer status disrupts the power dynamics in a prison because placing inmates in a position of authority over other inmates blurs the necessary distinction between staff and inmates; (4) inmates are not allowed to lead groups in other treatment programs or activities; (5) DOC historically has had problems with gangs taking over religious groups and making the groups covers for gang activity; (6) allowing inmates to lead such groups empowers gang leaders in such situations, which increases the potential for strong-arming, violence, introduction of contraband, group resistance and coordinated gang activities; and (7) gang activity becomes much more difficult to monitor and control with inmate led groups.

United States District Judge Barbara B. Crabb recently conducted a thorough analysis of this issue in *Greybuffalo v. Bertrand*, 2004 U.S. Dist. LEXIS 22356 (W.D. Wis. Nov. 1, 2004).  In that case, the plaintiff, who was a Native American prisoner, alleged that the defendants' denial of his proposal for a religious group for Native American inmates violated

the Free Exercise Clause of the First Amendment and RLUIPA.  *Id.* at *1.  The defendants

denied the plaintiff's request because they had dissolved all cultural groups due to: (1) concerns

about gang activity; (2) the disparity between the large enrollment requests and limited capacity;

and (3) limited physical space.  *Id.* at *4.  In addition, the institution did not have the capacity

to maintain a group for each culture represented in the population.  *Id.*  In granting the

defendants' motion for summary judgment, Judge Crabb noted that there were no facts

indicating that the defendants' refusal to allow the group to meet "bears a direct, primary and

fundamental responsibility for rendering religious exercises effectively impracticable." *Id.* *17.

Further, she held that there were no facts in the record suggesting that the activities that would

take place at council meetings do not already occur at other times and places. *Id.* at *17-18.

The present case in analogous.  Here, the plaintiff has alleged that Native

American inmates are prohibited from forming a Native American cultural group.  However,

it is undisputed that he is permitted to pray in his cell, to possess religious texts, to participate

in the weekly drum practice, to participate in the monthly sweat lodge, and participate in

religious feasts.  Further, the plaintiff has presented no facts tending to show how a Native

American cultural group would provide him with additional and different opportunities to

observe his religion.  Specifically, he has not shown that the activities that would occur during

the cultural activity group would be different from the activities that he is already permitted to

participate in.  Accordingly, the plaintiff has failed to demonstrate that the defendants' refusal

to allow him to form a Native American cultural activity group poses a substantial burden on

his exercise of religion.  Therefore, he cannot prevail on his RLUIPA claim.

### 6.    Religious Feasts

The plaintiff alleges that Native American inmates are only authorized to celebrate the Ceremonial Feast, and that they may not have feasts to celebrate a Pow Wow, the Feast of International Foods or the Ghost Feast. In addition, the plaintiff complains that the defendants refuse to allow traditional Native American foods that have been prepared outside the institution to be served at any feast.

Pursuant to IMP #6, only one feast per religion per year is allowed for each religious umbrella group, which means that a group of inmates can gather in one room and eat foods from the institution kitchen, and have a religious observance of some kind. No outside food is allowed into the institution. Native Americans are not allowed to celebrate the Feast of the Green Corn Moon because they celebrate the Ceremonial Feast instead. Assuming that celebrating multiple feasts is a necessary tenet of the plaintiff's religion, he has demonstrated that the defendants' one feast per year policy poses a substantial burden on his ability to practice his religion.

The defendants, however, have met their burden of justification by showing that they have a compelling state interest in limiting religious feasts to one per year per religious group. First, religious feasts are burdensome on RGCI's resources. For example: (1) it takes extra time to serve food in locations other than the institution kitchen; (2) arrangements must be made and coordinated by the staff; (3) notification of inmates approved to attend must be sent out; (4) notification of approved religious visitors must be sent out; and (5) outside religious visitors must be screened and processed into the institution. Religious feasts are also

burdensome on RGCI's security staff. That is, any time that inmates meet in a group, security concerns are implicated. Thus, additional security staff is usually necessary to supervise the group gathering. Budgetary concerns have been recognized as a compelling governmental interest. *Mack*, 80 F.3d at 1180; *Luckette v. Lewis*, 883 F. Supp. 471, 480 (D. Ariz. 1995); *Ross v. Blackledge*, 477 F.2d 616, 618 (4th Cir. 1973); *Barnett v. Rodgers*, 410 F.2d 995 (D.C. Ct. App. 1969).

The defendants have also met their burden of justification by showing a compelling state interest in preventing the use of foods prepared outside the institution. *See id.* In particular, their policy is warranted because: (1) it is difficult to search incoming food for contraband such as drugs or weapons; and (2) the institution would not know whether the conditions the food had been prepared in, whether or not appropriate temperatures had been maintained during transport to RGCI, and the difficulty of maintaining appropriate temperatures after delivery. Further, in the event that there were any cases of food poisoning, the state would be responsible for providing medical care and could face potential litigation. As discussed, maintaining safety and order in prisons is a compelling governmental interest. *Mack*, 80 F.3d at 1180.

The court notes that the DOC's restriction of one religious feast per year per religious umbrella group has survived scrutiny under RLUIPA. In *Charles v. Verhagen*, 220 F. Supp. 2d 937 (W.D. Wis. Apr. 15, 2002), the plaintiff asserted that the DOC's religious feast regulation violated his rights under the First Amendment and RLUIPA. *Charles*, 220 F. Supp. 2d at 938. The defendants responded that their restriction was warranted because the gathering

of inmates implicates numerous security and resource concerns. *Id*. at 947. In granting the defendants' motion for summary judgment, the court held that the defendants had met their burden of showing a compelling state interest and that the regulation was the least restrictive means available of furthering this interest. *Id.*

Similarly, the defendants in this case have presented evidence that they limit the number of religious feasts to one per year per umbrella group because of security and resource concerns. In addition, the defendants have indicated that in enacting this limitation, they sought to use the least restrictive means possible. In light of the foregoing, the plaintiff has failed to prove a RLUIPA violation.

### 7. Traditional Regalia

The plaintiff maintains that the defendants have prohibited him from possessing headbands, ribbon shirts, jewelry, looms and shells for traditional ceremonial dances. Under IMP #6A, inmates may personally possess religious property items to the extent they do not present a threat to the order and safety of the institution. Native American inmates may not personally possess headbands, ribbon shirts, jewelry and looms. They may, however, may use an abalone shell during the sweat lodge ceremony. The shell is but it is kept under the Chaplain's control at all other times. It is unclear whether the defendants' policy of prohibiting these items poses a substantial burden on the plaintiff's free exercise of religion.

Regardless, the defendants have demonstrated that they have a compelling state interest in prohibiting Native American inmates from personally possessing headbands, ribbon shirts, jewelry and looms. These items create security and safety issues for the following

reasons: (1) beads used in headbands, jewelry could be used to make a crude weapon; (2) beads and jewelry can be fashioned into a key capable of unlocking handcuffs; (3) metal jewelry, beads or spacers can be melted down to create unauthorized objects such as edged weapons, keys and badges; (4) ribbon shirts, jewelry, looms, shells and rattles create a security concern due to the possibility of items being hidden with the objects; and (5) headbands and ribbon shirts could be used to conceal an inmate's identity, which could facilitate escape.

It was also important for DOC to restrict the number of personal property items when revising IMP #6A because of the collective impact on the security, management and resources. The management of an inmate's personal property involves a multi-step process, which includes, among other things, review of the inmate's request, ordering the requested item, ensuring the item does not contain contraband once it arrives at RGCI, and cataloging and monitoring the item once it is made part of the inmate's personal property.

As discussed, safety and order concerns are compelling governmental interests. *Mack*, 80 F.3d at 1180. Further, resource and budgetary concerns also justify limiting inmates' access to personal property items. *See id.* For the foregoing reasons, the defendants have demonstrated that the restriction on Native American religious property furthers a compelling governmental interest. In addition, there is no indication that they have not pursued this interest through the least restrictive means possible. Therefore, the defendants' regulation survives scrutiny under RLUIPA.

### 8. Religious Participation by Non-Native American Inmates

The plaintiff alleges that the defendants allow non-Native American inmates to participate in Native American religious ceremonies. It is not clear, however, that non-Native American inmates are permitted to attend Native American religious services. Indeed, the record indicates that inmates are only permitted to attend congregate religious services if they have designated that religion as their religion of choice.

However, in the event that non-Native Americans are permitted to attend Native American religious ceremonies, the plaintiff has given no indication as to how such an occurrence could ever be so severe as to violate his rights under RLUIPA. Rather, the only information he has submitted to the court is that "the institution practices a (sic) open door policy that allows any non Indian prisoner to be a part of the Native American Indian Practices and...ceremonies." (Compl. at 5). Based on the foregoing, the court is not convinced that the allowance of non-Native Americans Native American religious events "necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise...effectively impracticable." *Civil Liberties for Urban Believers,* 342 F.3d at 761.[7] Thus, the plaintiff cannot prevail on a RLUIPA claim.

---

[7]Although the defendants are not required to prove a compelling state interest where no substantial burden has been imposed, the court notes that the defendants have stated that it is the intention of the DOC to facilitate religious practice and not to permit exclusions based on race, heritage or origin. In addition, requiring proof of Native American ethnicity to participate in the Native American religious group would likely violate the constitutional rights of other inmates. In *Brown v. Schultz*, 368 F. Supp. 2d 1009 (N.D. May 4, 2005), the court held that prison officials were prohibited under the First Amendment from adopting a policy that prevented non-Native American inmates from attending the sweat lodge ceremony. Also, in *Morrison v. Garraghty*, 239 F.3d 648 (4th Cir. 2001), the Court of Appeals for the Fourth Circuit held that the defendants' policy of conditioning the plaintiff's receipt of Native American spiritual articles upon proof that he was of Native American descent violated the plaintiff's right to equal protection.

-42-

In conclusion, the court finds that all of the plaintiff's claims fail under RLUIPA. Hence, the plaintiff is precluded from proving his First Amendment claims. *Compare* 42 U.S.C. § 2000cc-1(a), *with Lindell,* 377 F.3d at 657. Accordingly, the defendants' motion for summary judgment must be granted.

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

On November 3, 2005, the plaintiff filed a motion for preliminary injunction. In deciding whether to grant a motion for a preliminary injunction, the court should consider (1) whether the moving party has an adequate remedy at law; (2) whether he will suffer irreparable harm if the preliminary injunction is not issued; (3) whether the irreparable harm he will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendant will suffer if the injunction is granted; (4) whether he has a reasonable likelihood of prevailing on the merits; and (5) whether the injunction will not harm the public interest. *Ty, Inc. v. Jones Group*, Inc., 237 F.3d 891, 895 (7th Cir. 2001). The moving party's threshold burden is to establish the first and second factors and to show "some likelihood of success on the merits." *Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1371 (7th Cir. 1989) (emphasis in original); *see also Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1453 (7th Cir. 1995). Once the initial burden is met, the inquiry then becomes a sliding scale analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits. *Ping*, 870 F.2d at 1371.

As grounds for his request, the plaintiff states that: (1) the defendants have imposed time constraints on the sweat lodge ceremony; (2) the defendants prohibit Native American inmates

from tending to the sweat lodge fire; (3) the defendants prohibit him from smoking his prayer pipe on a daily basis; (4) the defendants do not allow Native American inmates to have a weekly prayer pipe ceremony; (5) the defendants refuse to allow the use of traditional foods that have been prepared outside RGCI; (6) the defendants have prevented the plaintiff from designating a Native American inmate as a group pipe bearer; (7) the plaintiff is prevented from smoking the prayer pipe during drum practice; (8) there is no policy to protect the Native American Spiritual Advisor from being harassed; (9) the defendants deny the plaintiff a two quart pitcher of water during the drum practice; and (10) there is no policy to prevent the plaintiff from racial slurs made by staff and other inmates. (Pl.'s Mot. for Preliminary Injunction at 7-10).

The court notes that the plaintiff was incarcerated at RGCI when he filed his motion for preliminary injunction. However, on January 5, 2006, he was transferred to SCI. In addition, the plaintiff has not given any indication that he is exposed to the same limitations at SCI. Accordingly, the plaintiff's request for injunctive relief is moot. *Stewart v. McGinnis*, 5 F.3d 1031, 1038 (7th Cir. 1993); *Martin v. Davies*, 917 F.2d 336, 339 (7th Cir. 1990).

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Doc. # 79) is **granted.** This case is dismissed and the Clerk of Court is ordered to enter judgment accordingly.

**IT IS FURTHER ORDERED** that the plaintiff's motion for preliminary injunction (Doc. # 28) is **denied as moot.**

Dated at Milwaukee, Wisconsin, this 6th day of September, 2006.

**SO ORDERED,**


**s/ Rudolph T. Randa**
**HON. RUDOLPH T. RANDA**
**Chief Judge**